**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| First Ascent Ventures, Inc., a Colorado corporation; First Ascent Lone Tree, a Colorado corporation,<br><br>                     Plaintiffs,<br><br>v.<br><br>DLC Dermacare, LLC, an Arizona limited liability company,<br><br>                   Defendant. | No. CV-06-1794-PHX-JAT<br><br>**ORDER** |
| DLC Dermacare, LLC, an Arizona limited liability company,<br><br>                Counterclaimant,<br><br>v.<br><br>First Ascent Ventures, Inc., a Colorado corporation; First Ascent Lone Tree, Inc., a Colorado corporation; Peter C. Hill and Elizabeth S. Hill, husband and wife; Randal A. Dick and Laura G. Dick, husband and wife,<br><br>              Counterdefendants. | |

AND NOW, this 24th day of October, 2006, upon consideration of the parties' cross motions for preliminary injunction and having held a trial on the merits, the Court finds:

**FINDINGS OF FACT**

1.     First Ascent Ventures, Inc. ("Ventures") is a Colorado corporation with its principal place of business located in Denver, Colorado.

2.    First Ascent Ventures Lone Tree, Inc. ("Lone Tree")  is a Colorado corporation with its principal place of business located in Denver, Colorado.

.    First Ascent and Lone Tree are separate corporations, under common ownership and control.

3.    DLC Dermacare, LLC ("Dermacare") is an Arizona limited liability company with its principal place of business located in Phoenix, Arizona.

4.    Dermacare's sole member is Carl J. Mudd.

5.    Mr. Mudd is a citizen of the State of Arizona.

6.    Dermacare has developed a system for operating and promoting retail clinics selling laser skin care services and ancillary skin care treatments and products. Dermacare authorizes and licenses franchise rights to individual franchisees to operate Dermacare clinics using Dermacare's proprietary franchise system

7.    On April 21, 2005, Dermacare and plaintiff/counterdefendant Ventures executed a Clinic Franchise Agreement (the "Ventures CFA"), which gave Ventures the exclusive right and license to operate a Dermacare clinic within a specified territory in and around Cherry Creek, Colorado.

8.    On April 21, 2005, Dermacare and Ventures also executed a Master Regional Franchise Agreement (the "MRFA"), which gave Ventures the right to own and operate a "master regional franchise," whereby Ventures had the exclusive right to solicit other franchisees to own and operate Dermacare franchise clinics within the State of Colorado and to receive a percentage of the royalties paid to Dermacare by any such franchisees.

9.    Ventures is owned by counterdefendants Peter Hill, Elizabeth Hill, Randal Dick, and Laura Dick (collectively the "Owners").  Each of the Owners signed a Confidentiality Agreement and Covenant of Noncompetition, which is attached as Exhibit 3 to the Ventures CFA.  Section 11 of that agreement provides that its non-compete provisions (Sections 9 and 10) shall be "construed as independent of any other covenant or provision of any agreement."  Section 13 further provides that the agreement, "shall be enforceable notwithstanding the existence of any claim or cause of action of the [Owners]

2

against [Ventures] and [Dermacare], or either of them, predicated on any contract or other basis whatsoever."

10.     On August 4, 2005, plaintiff/counterdefendant Lone Tree executed a Clinic Franchise Agreement (the "Lone Tree CFA"), which gave Lone Tree the exclusive right and license to operate a Dermacare clinic within a specified territory in and around Lone Tree, Colorado.

11.     The Owners also own Lone Tree.  On August 4, 2005, each of the Owners signed a  Confidentiality Non-Solicitation and Restrictive Covenant Agreement, which is attached as Exhibit F to the Lone Tree CFA.  Section 12 of that agreement reads, in part: "Due to the importance of this Agreement to the Franchisee and [Dermacare], any claim I have against the Franchisee or [Dermacare] is a separate matter and does not entitle me to violate, or justify any violation of this Agreement."

12.     The covenants not to compete signed by the Owners in their individual capacities preclude the Owners, for a period of three years following the termination of the Ventures CFA or the Lone Tree CFA, from owning, maintaining, or having any interest in a "Competitive Business" located or doing business within the designated franchise area of Ventures or Lone Tree or within thirty miles of a Dermacare clinic.

13.     The Ventures CFA and the MRFA contain a virtually identical covenant not to compete provision (Section 13.5) that applies to Ventures.

14.     The Lone Tree CFA contains a virtually identical covenant not to compete provision (Section 17.2) that applies to Lone Tree.

15.     In connection with the Franchise Agreements, Ventures paid to Dermacare a total of $168,750.00  - representing an Initial Master Franchise Fee of $150,000.00 and an Initial Franchise Fee relating to the Lone Tree CFA of $18,750.00.  Additionally, the counterdefendants have incurred debts and other obligations in exceeding $1 million in the  organization, development, and operation of their former Dermacare clinics.

16.     Prior to April 2005, none of the Owners had any experience or training in the laser skin care industry or in any aspect of operating or managing a laser skin care clinic.

17.    Pursuant to the Ventures CFA, from December 12, 2005 to July 17, 2006, Ventures operated a Dermacare clinic using the name "Dermacare Laser & Skin Care Clinics," located at 3030 E. 2nd Avenue, Denver, Colorado 80206 and using the telephone number 303-377-5400.

18.    Pursuant to the Lone Tree CFA, from October 3, 2005 to July 17, 2006, Lone Tree operated a Dermacare clinic using the name "Dermacare Laser & Skin Care Clinics" located at 9898 Rosemont Avenue, Ste. 103 & 104, Lone Tree, Colorado 80124 and using the telephone number 303-706-0900.

19.    Shortly after Ventures executed the Ventures CFA and the MRFA, Dermacare provided Ventures with a set of Dermacare's manuals (the "Manuals"), which comprise approximately 15 separate binders and thousands of pages.  The Manuals contain information, data, forms, processes, and techniques developed and prepared by Dermacare regarding various aspects of opening, operating, and managing a laser skin care clinic, including, among other things, pre-opening items, advertising and marketing, client intake, sales consultation, front office administration, human resources and payroll, computer and software utilization, and risk management.  These materials were provided to Ventures solely for Ventures's use in connection with the ownership and operation of its Dermacare clinic.

20.    During the course of Ventures's and Lone Tree's tenure as Dermacare franchisees, Dermacare also supplied counterdefendants with various other training materials, including videos, CD's, and DVD's.

21.    Pursuant to section 4.1(b) of the Ventures CFA and section 4.1 of the Lone Tree CFA, Dermacare provided counterdefendants with at least forty (40) hours of office management training regarding the fundamentals of operating a Dermacare clinic.  In August 2005, Peter Hill and Elizabeth Hill attended a 5-day office management training program conducted by Dermacare in Phoenix, Arizona.  In September 2005, Randal Dick and Laura Dick attended a 5-day office management training program conducted by Dermacare in Phoenix, Arizona.

22.    Pursuant to section 4.1(a) of the Ventures CFA and section 4.1 of the Lone

4

Tree CFA, Dermacare provided counterdefendants with at least forty (40) hours of initial technical training.  In September 2005, two medical employees of Ventures attended a 5-day technical training program conducted by Dermacare in Phoenix, Arizona.

23.    On October 2, 2005, Peter Hill and Randal Dick sent an e-mail to Carl Mudd and others at Dermacare praising Dermacare for its training programs, marketing assistance, and operational support during the past five months.

24.    Pursuant to section 4.1 of the MRFA, Dermacare provided counterdefendants with an initial training program regarding the fundamentals of operating a master regional franchise.  In February 2006, Peter Hill and Randal Dick attended a 2-day master regional franchise training program conducted by Dermacare in Scottsdale, Arizona.

25.    On February 21, 2006, Peter Hill sent an e-mail to Carl Mudd and others at Dermacare describing the master regional franchise training program as "fantastic."

26.    In January 2006, before attending the master regional franchise training, Peter Hill helped to coordinate, and participated in, a trade association meeting of other Dermacare franchisees, which took place in Dallas, Texas.

27.    Carl Mudd strongly disapproved of the meeting and the idea of a Dermacare franchisee trade association without involvement by Dermacare corporate.  Mr. Mudd viewed such an association as a threat to Dermacare.

28.    Mr. Hill's and Mr. Dick's involvement in the trade association meeting angered Carl Mudd.  In the months following the trade association meeting, Mr. Mudd began building a case for terminating the Ventures and Lone Tree franchises.

29.    At a February 2006 meeting in Mr. Mudd's hotel suite, Mr. Mudd told Peter Hill and Randal Dick that they should get out of the business and threatened termination of their franchises.

30.    In early June 2006, Carl Mudd again told Peter Hill, over the phone, that Mr. Mudd was terminating the First Ascent and Lone Tree franchises and that he had cause to do so.

31.     In that same conversation, Mr. Mudd informed Mr. Hill that they could avoid termination of the franchises if the Hills bought out the Dicks' interests in the franchises or to otherwise terminate the Dicks' interests in the franchises.  Mr. Mudd asked Mr. Hill to come to Phoenix for a meeting to discuss the future of the franchises.

32.     Mr. and Mrs. Hill attended a meeting with Mr. Mudd at Dermacare's offices in Phoenix on June 14, 2006.

33.     At the June 14 meeting, Mr. Mudd threatened to terminate the Ventures and Lone Tree franchises if the Owners did not agree to proposed amendments to the franchise agreements.  Among other things, the proposed amendments would have prohibited counterdefendants from engaging in communications with Dermacare franchisees outside of Colorado and would have limited them to speaking with only Mr. Mudd at Dermacare corporate.

34.     Mr. Mudd also warned the Hills at the meeting about trying to go against Dermacare because franchisors have all the power.  In order to reinforce this threat, Mr. Mudd them a story about his previous unsuccessful litigation against a franchisor that resulted in his financial ruin.

35.     On June 23, 2006, Mr. Mudd informed Elizabeth Hill that Dermacare would not grant any of her requests to use local advertising fund money to purchase advertising and media placements.   Lone Tree had paid approximately $16,000 into the local advertising fund.

36.     Mr. Mudd thought it was ridiculous that the counterdefendants were requesting advertising funds when he felt the future of their franchises was so uncertain.

37.     Employees at Dermacare corporate knew that Carl Mudd had problems with the Owners.

38.     At some point in late June 2006, Mr. Mudd essentially cut off all communications between anyone at Dermacare and the Ventures and Lone Tree franchises.  He instructed his employees not to speak with anyone from Ventures or Lone Tree.

39.     On July 10, 2006, counsel for Ventures, Lone Tree, and the Owners sent a letter to counsel for Dermacare asserting that Dermacare was in breach of the Ventures CFA, the Lone Tree CFA, and the MRFA and that, unless Dermacare's breaches were cured by July 17, 2006, those contracts would be "terminated immediately, without further notice."

40.     On July 14, 2006, Carl Mudd sent a letter to Ventures and Lone Tree asserting that, based upon counterdefendants' July 10, 2006 letter, Dermacare deemed the Ventures CFA, the Lone Tree CFA, and the MRFA to be terminated as of 12:01 a.m., July 17, 2006.

41.     On July 16, 2006, counsel for Ventures, Lone Tree, and the Owners sent a letter to Dermacare asserting that Ventures and Lone Tree were purporting to rescind the Ventures CFA, the Lone Tree CFA, and the MRFA.

42.     The  Ventures CFA, the Lone Tree CFA, and the MRFA terminated as of July 17, 2006.

43.      From July 17, 2006 to the present, Ventures and Lone Tree have continued to own and operate two retail laser skin care clinics at the precise same locations as their former Dermacare clinics, offering the same skin care services, treatments, and products that they formerly offered as Dermacare franchisees.  Ventures and Lone Tree are currently operating these laser skin care clinics under the name RenewSkin Care ("RenewSkin").

44.     The laser skin care clinics owned and operated by Ventures and Lone Tree using the name RenewSkin constitute "Competitive Business(es)," as defined in the non-compete provisions of the parties' contracts.

45.     Since July 17, 2006, Ventures and Lone Tree have solicited and provided skin care treatments to former customers of their Dermacare clinics.

46.     Since July 17, 2006, Ventures has not assigned the telephone number 303-377-5400 and Lone Tree has not assigned the telephone number 303-706-0900 to Dermacare as required by contract.  Ventures and Lone Tree have included these

telephone numbers in various advertisements for their laser skin care clinics after termination of their Dermacare franchises.

47.      Since the termination of the franchises, Ventures and Lone Tree have sent direct mail advertisements to former Dermacare customers informing them that "they are no longer Dermacare" and that, other than changing the names of their clinics to RenewSkin, "nothing else has changed."

48.      For at least two weeks after the termination of its franchise, a sign remained on the exterior of Ventures's clinic reading, "Dermacare Laser & Skin Care Clinics," with a Dermacare proprietary logo.

49.      Counterdefendants waited until August 16, 2006, to return to Dermacare five (5) boxes of Dermacare materials, including Dermacare's Manuals and various training, marketing, and sales consultation materials.

## CONCLUSIONS OF LAW

Jurisdiction and Venue

1.      The Court has personal jurisdiction over the parties to this action.

2.      The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a).

3.      Venue is proper in this judicial district pursuant to 8 U.S.C. §1391.

Restrictive Covenants

4.      This Court need not and does not reach a decision as to whether either party or both parties materially breached their pre-termination obligations under the franchise agreements.

5.      But even if Dermacare breached the franchise agreements, the alleged breaches did not amount to a substantial or an entire failure of consideration entitling counterdefendants to equitably rescind the franchise contracts.  *See Amos Flight Operations, Inc. v. Thunderbird Bank*, 540 P.2d 1244, 1248 (Ariz. 1975) (an "entire or substantial failure of consideration" justifies rescission); *Seitz v. Indus. Comm'n of Arizona*, 911 P.2d 605, 609 (Ariz. Ct. App. 1995) (The remedy of rescission requires a "vital" breach of contract that represents a substantial failure of consideration).  The Court

8

delineated in paragraphs 19 through 25 of its Findings of Fact some of the many examples of Dermacare's performance under the franchise agreements and the counterdefendants' praise of that performance.  Further, Ventures and Lone Tree operated at a profit for several months, even though none of the Owners had any prior experience in the laser skin care industry, as Dermacare franchisees.   These facts negate counterdefendants' argument that a substantial failure of consideration occurred.

6.    The covenant not to compete provisions in the contracts signed by Ventures, Lone Tree, and the Owners are reasonably limited as to time and geographic territory.

7.    Counterdefendants have breached the following covenant not to compete provisions in their contracts:  (1) section 13.5 of the Ventures CFA; (2) section 17.2 of the Lone Tree CFA; (3) section 13.5 of the MRFA; (4) section 9 of the Confidentiality Agreement and Covenant of Noncompetition; and (5) section 9 of the Confidentiality Non-Solicitation and Restrictive Covenant Agreement.  Counterdefendants' breaches of the foregoing provisions have continued to today.

8.    At least two of the Owners are sophisticated and experienced business people who admitted to reviewing and understanding the covenants not to compete that they signed only after consultation with their lawyers.  And the covenants specifically provide that the prohibitions against competition shall survive any termination of the franchise agreements and shall be enforced despite any claims for breach that the counterdefendants might have against Dermacare.  The counterdefendants are therefore bound by those covenants regardless of whether Dermacare breached the franchise agreements.  *See, e.g., Barnes Group, Inc. v. O'Brien*, 591 F. Supp. 454, 463 (N.D. Ind. 1984) (The restrictive covenant at issue in *Barnes* read, in pertinent part, "the existence of any claim or cause of action . . . shall not constitute a defense to the enforcement by the [plaintiff] of this covenant," and the court held, "The court must give effect to the parties' intent.  Therefore, the restrictive covenant is enforceable irrespective of the alleged breach of contract by the plaintiff."); *Orkin Exterminating Co. v. Harris*, 164 S.E.2d 727, 729 (Ga. 1968) (rejecting the defendant's attempt to excuse admitted violation of non-

compete provision based upon plaintiff's alleged breach of other contractual provisions).

9.      As a result of counterdefendants breaching their covenant not to compete provisions, Dermacare has suffered irreparable harm, including the loss of its goodwill, the inability to establish a new franchise in the former territories of Ventures and Lone Tree without competition from Ventures and Lone Tree, the loss of its actual and potential customer base, and intangible damage to its franchise system. *See, e.g., Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (preliminary injunction necessary to enforce non-compete, as continued operation of competitive business would cause irreparable harm to company's goodwill); *Jiffy Lube Int'l Inc. v. Weiss Bros., Inc.*, 834 F. Supp. 683, 691 (D.N.J. 1993) (franchisee's breach of covenant not to compete would irreparably harm franchisor through damage to goodwill and inability to establish new franchise).

10.     Nonetheless, an injunction is "an equitable remedy that does not issue as of course." *Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987). A party "who seeks equity must do equity." *County Sanitation Dist. No. 2 of Los Angeles County v. Inland Container Corp.*, 803 F.2d 1074, 1080 (9th Cir. 1986).  In order to obtain an injunction in this case, Dermacare must have "acted *fairly* and without fraud or deceit as to the controversy in issue." *Adler v. Fed. Republic of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000) (emphasis added).  Under the unclean hands doctrine, a court will not grant equitable relief to a party "tainted with inequitableness or bad faith relative to the matter in which he seeks relief . . . ." *Id*.  Bad intent is the essence of the unclean hands defense. *Dollar Sys., Inc. v. Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989).

11.     Dermacare, through its sole member and president Carl Mudd, acted unfairly, inequitably, and with bad intent in: 1) attempting to coerce the Hills into getting rid of the Dicks and into signing highly restrictive amendments to the franchise agreements; 2) threatening the Hills with financial ruin if they attempted to do legal battle with Dermacare; 3) instructing Dermacare employees to have no contact with counterdefendants; 4) cutting off all brand and marketing support to counterdefendants;

and 5) more generally, attempting to freeze First Ascent and Lone Tree out of the Dermacare system.

12.    Because Dermacare acted in bad faith in performing, or failing to perform, under the franchise agreements, and in basically attempting to drive Ventures and Lone Tree out of the franchise system, the unclean hands defense bars it from seeking to enjoin counterdefendants pursuant to the franchise agreements from operating competing clinics in the Denver area.

13.    Dermacare has a proprietary interest in its name, logos, Marks, Manuals, other confidential materials, and telephone numbers.  An injunction will issue to protect that interest against counterdefendants who are no longer a part of the Dermacare franchise.

14.    Because the Court did not rescind the franchise agreements, the mandatory arbitration clauses remain in effect.  The First Ascent CFA requires First Ascent to resolve all claims other than a claim for injunctive relief in arbitration.  The Lone Tree CFA requires Lone Tree to resolve all claims, equitable and legal, in arbitration.  The Court will therefore grant Dermacare's Partial Motion to Dismiss Plaintiffs' Second Amended Complaint.

Based on the foregoing Findings and Conclusions,

 IT IS HEREBY ORDERED GRANTING IN PART a Permanent Injunction to Dermacare against Counterdefendants as follows (Doc. #13 and Doc. #54 converted to motions for permanent injunction):

 Ventures, Lone Tree, the Owners, and those persons in active concert or participation with them, shall be immediately and permanently enjoined and restrained from the following acts:

A.    Using, through advertising or any other manner, the name "Dermacare Laser & Skin Care Clinics," the phrases "Dermacare," "Erase," and "The Science of Aesthetics," any other names or marks used in the Dermacare System, and any logos used

by Dermacare or affiliated with the Dermacare System;

B.      Using any and all of the confidential Manuals provided by Dermacare concerning various aspects of operating and managing a Dermacare clinic and any other materials Dermacare furnished to Counterdefendants in connection with their Dermacare franchises;

C.      Advertising in any way that Counterdefendants are or ever were franchisees of Dermacare or otherwise affiliated with Dermacare or the Dermacare System; and

D.      Using the telephone numbers 303-377-5400 or 303-706-0900 (or any other telephone numbers formerly used by counterdefendants to operate a Dermacare clinic) for any purpose whatsoever.

IT IS FURTHER ORDERED that Counterdefendants shall immediately take the following actions:

A.      Direct the telephone company servicing Ventures and Lone Tree to immediately transfer to Dermacare's headquarters in Phoenix, Arizona (or any other location designated by Dermacare) the telephone numbers 303-377-5400 and 303-706-0900; and

B.      To the extent they have not already done so, return to Dermacare any and all materials (including copies thereof) bearing Dermacare's marks, including, but not limited to, advertising materials, training materials, stationery and printed forms, and all proprietary information relating to the operation or business goodwill of Counterdefendants' former Dermacare clinics.

IT IS FURTHER ORDERED that Plaintiffs'/Counterdefendants' Motions for Preliminary Injunction (Docs. #5 and #46 converted to motions for permanent injunction) are denied to the extent that such requests are inconsistent with this order.

IT IS FURTHER ORDERED GRANTING Dermacare's Partial Motion to Dismiss Plaintiffs' Second Amended Complaint (Doc. #53) and denying the original Motion to Dismiss (Doc. #11) as moot.

IT IS FURTHER ORDERED that the Motion in Limine (Doc. #59) is denied as moot because Plaintiffs/Counterdefendants never attempted to admit such evidence.

IT IS FURTHER ORDERED that the Motion to Continue Trial (Doc. #70) is denied for the reasons stated on the record.

IT IS FURTHER ORDERED that the Clerk of the Court shall enter judgment of a permanent injunction to Dermacare as detailed above with regard to the equitable claims; the Clerk of the Court shall also enter judgment of dismissal without prejudice for lack of subject matter jurisdiction for all claims at law as a result of the granting of Dermacare's partial motion to dismiss.

DATED this 24th day of October, 2006.


James A. Teilborg
United States District Judge